UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CHARLOTTE WILLOUGHBY** and **LAKENDREA CAMILLE MCNEALY,** individually and on behalf of a class of similarly situated individuals, )))))) | Case No. _____ |
| **PLAINTIFF**, )))) | |
| V. )) | **DEMAND FOR JURY TRIAL** |
| **ABBOTT LABORATORIES**, )))) | |
| **DEFENDANT**. . | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Charlotte Willoughby and LaKendrea Camille McNealy (collectively,

"Plaintiffs"), individually and on behalf of all others similarly situated, by and through their

undersigned attorneys, bring this Class Action Complaint against Defendant Abbott Laboratories

("Defendant") for its knowing, reckless, and/or intentional practice of failing to fully disclose the

presence of arsenic, cadmium, lead, or mercury (collectively, "Heavy Metals") in its Similac®

powdered infant formulas ("Products" or "Infant Formulas").[1] The Infant Formulas are sold

throughout the United States and do not conform to their packaging.  Plaintiffs seek both injunctive

and monetary relief on behalf of the proposed Classes (as defined herein), including requiring full

---

[1] "Products" or "Infant Formulas" refers to the following Abbott Laboratories products: Similac® Pro Advance, Similac® 360 Total Care, Similac® Soy Isomil Similac® Advance OptiGRO Powder – Milk-Based, and Similac® Neosure powdered infant formulas. Discovery may reveal additional products that contain levels of Heavy Metals.  Plaintiffs reserve their right to include any such products in this action.

disclosure of all such substances in the Products' packaging, and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      Babies rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics recommends breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[2] However, according to the Centers for Disease Control and Prevention ("CDC"), only 46.3% of babies under three months old are exclusively breastfed, and the percentage of babies exclusively breastfed through six months drops to 25.8%.[3] For babies younger than six months, the CDC recommends that breast milk or infant formula are the only things they eat for their nutrition, and while supplementing with some solid food, breastmilk or infant formula is recommended up to when they are 24 months old.[4] Therefore, a significant number of babies rely on infant formulas for their growth and nutrition in the first year of their lives and beyond.

---

[2]      Infant and Toddler Nutrition: Recommendation and Benefits cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits.html (last accessed on March 11, 2022).

[3] Key Breastfeeding Indicators, available at https://www.cdc.gov/breastfeeding/data/facts.html (last accessed on March 11, 2022).

[4] https://www.cdc.gov/nutrition/InfantandToddlerNutrition/foods-and-drinks/when-to-introduce-solid-foods.html (last accessed on March 11, 2022).

3.      Reasonable parents, like Plaintiffs, trust manufacturers, like Defendant, to sell infant formula that is healthy, nutritious, and free from harmful toxins, contaminants, and chemicals. They certainly expect the formula they feed their infants to be free from Heavy Metals, substances known to have significant and unsafe developmental and health consequences.

4.      Consumers lack the scientific knowledge necessary to determine whether the Defendant's Products do in fact contain (or have a material risk of containing) Heavy Metals or to ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its Products contain. This is especially true for a product's contents like arsenic, lead, cadmium, and mercury that are being fed to hours, days- or months-old babies. Such information would be material to any reasonable parent's purchasing decisions.

5.      To justify a premium price and induce reasonable consumers to believe in the quality and safety of its Products, Defendant's packaging emphasizes that the Infant Formulas are healthy, nutritious, and made with superior ingredients and not made with detrimental and genetically engineered ingredients while omitting any information about the inclusion (or material risk) of Heavy Metals.








6.    Defendant states the Infant Formulas contain superior ingredients such as Docosahexaenoic Acid ("DHA"), prebiotics such as human milk oligosaccharides ("HMO"), and lutein and beta-carotene.[5]



7.    Based on the impression given by the packaging and the material nondisclosures, no reasonable consumer could expect or understand that the Infant Formulas contained Heavy Metals. This is especially true as the development and physical risks created by ingestion of Heavy Metals by infants is well-recognized.

8.    Defendant uses its other marketing to further promise a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website: (1) to give babies "the

---

[5] https://www.similac.com/baby-formula-ingredients.html (last accessed March 11, 2022).

very best, with nutrition [parents] can trust to keep [babies] fed, happy, and healthy;"[6] (2) that parents "can be confident in the nourishment of Similac;"[7] and that (3) that its Products are "enriched with key vitamins, minerals, and nutrients to help give your little one a strong start[,]"[8] This is all in direct contradiction to the true nature of the Infant Formulas' contents, which include Heavy Metals.

9.      The Infant Formulas have been shown to contain detectable levels of arsenic, cadmium, lead, mercury, and/or perchlorate, all known to pose health risks to humans, and particularly to infants.[9]

10.     Despite this, Defendant knowingly chose to not disclose to consumers that the Infant Formulas contain (or have a material risk of containing) Heavy Metals. Nowhere on the Infant Formulas' packaging is it disclosed that they contain (or have a material risk of containing) Heavy Metals (hereinafter collectively referred to as "Omissions").

11.     The Infant Formulas' packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence. Likewise, nothing on the packaging states that ingestion of Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

12.     Instead, to justify a premium price, Defendant chose to focus on promoting its Infant Formulas as high quality, made with superior ingredients and not made with detrimental and genetically engineered ingredients.

---

[6] https://www.similac.com/the-similac-difference.html (last accessed March 11, 2022).

[7] https://www.similac.com/why-similac.html (last accessed March 11, 2022).

[8] https://www.similac.com/the-similac-difference.html (last accessed March 11, 2022).

[9] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?* ("HBBF Report"), available at  https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed March 11, 2022).

13.     On information and belief, it was recently revealed that Defendant was knowingly, recklessly, and/or intentionally selling Infant Formula that contained arsenic, cadmium, lead, and mercury.

14.     Indeed, the World Health Organization ("WHO") and UNICEF acknowledged the troubling marketing efforts by infant formula manufacturers, and recently released a new report titled "How Marketing of Formula Milk Influences Our Decisions on Infant Feeding."[10] This report raises deep concerns over the lasting and pervasive negative effects from the false and misleading information received by parents such as Plaintiff through such aggressive marketing efforts by infant formula manufacturers such as Defendant.[11]

15.     Exposure to Heavy Metals has significant and dangerous health consequences. A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Congressional Committee Report") highlighted the risk of including Heavy Metals in baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[12]

---

[10]     https://www.who.int/teams/maternal-newborn-child-adolescent-health-and-ageing/formula-milk-industry (last accessed March 2, 2022).

[11] Infant formula promoted in 'aggressive' and 'misleading' ways, says new global report, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed March 2, 2022).

[12]U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed March 11, 2022) ("Congressional Committee Report"). *See also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed March 11, 2022) ("Second Congressional Committee Report").

16.     Recent testing conducted on three of the Similac® Infant Formulas confirmed the presence of Heavy Metals, to include:

| Infant Formula | Level of Heavy Metal in parts per billion ("ppb") |
| --- | --- |
| Similac® Soy Isomil | 11.4 ppb Cadmium |
| Similac® 360 Total Care | 6.7 ppb Arsenic |
| Similac® Pro Advance | 10.1 ppb Mercury |

17.     Independent testing also confirmed the presence of two Heavy Metals in another of Defendant's products:[13]

| Infant Formula | Level of Arsenic | Level of Lead |
| --- | --- | --- |
| Similac® Advance OptiGRO Powder – Milk-Based | 4.6 ppb | 2 ppb |

18.     Based on the Omissions, no reasonable consumer had any reason to know or expect that the Infant Formulas contained Heavy Metals. Furthermore, reasonable parents, like Plaintiffs, who were feeding the Infant Formulas to their babies (multiple times a day) would consider the mere presence (or risk) of Heavy Metals a material fact when considering whether to purchase the Infant Formulas.

19.     Defendant knows its customers trust the quality of its products and expect the Infant Formulas to be free of Heavy Metals. They also know its consumers seek out and wish to purchase premium infant formulas that possess superior ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for infant formulas they believe possess these

---

[13] HBBF Report, *supra*, at 20, 34.

qualities. Defendant also knows no reasonable consumer would knowingly provide his or her children with infant formula that contained Heavy Metals.

20.     Defendant knew the parents to whom it marketed the Infant Formulas would find the Omissions material and that it was in a special position of public trust to those consumers.

21.     The Omissions are deceptive, misleading, unfair, and/or false because the Infant Formulas contain (or risk containing) undisclosed levels of Heavy Metals.

22.     The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formulas that did not disclose material information as to the Products' true quality and value. Defendant continues to wrongfully induce consumers to purchase its Infant Formulas.

23.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), whom, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendant's Infant Formulas.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value or $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not apply.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs suffered injury as a result of Defendant's acts in this District, many of the acts and transactions

giving rise to this action occurred in this District, and Defendant conducts substantial business in this District and is headquartered in this District.

## THE PARTIES

26.     Plaintiff Charlotte Willoughby ("Plaintiff Willoughby") is, and at times relevant hereto was, a citizen of the State of Illinois and a resident of Palatine, Illinois. She purchased the Infant Formula, including Similac® Neosure.

27.     Plaintiff Willoughby purchased the infant formula for her children from a Jewel-Osco Grocery Store in Palatine, Illinois, from approximately May until July of 2019.

28.     Plaintiff Willoughby believed she was feeding her children healthy and nutritious Infant Formula. Prior to purchasing the Infant Formula, Plaintiff Willoughby saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals, and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (or have a material risk of containing) Heavy Metals.

29.      Plaintiff LaKendrea Camille McNealy ("Plaintiff McNealy") at times relevant hereto was a citizen of the State of Minnesota and currently resides in the State of Texas. She purchased the Infant Formula, including Similac® Soy Isomil.

30.     Plaintiff McNealy purchased the Infant Formula for her child from Walmart in Apple Valley, Minnesota, from approximately December of 2018 until March of 2019.

31.     Plaintiff McNealy believed she was feeding her child healthy and nutritious infant formula. Prior to purchasing the Infant Formula, Plaintiff McNealy saw and relied upon the

packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals, and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

32.     As the result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiffs were injured when they paid the purchase price or a price premium for the Infant Formula that did not deliver what was  promised by Defendant.  Plaintiffs paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were free of Heavy Metals, and the Infant Formulas were safe for consumption. Plaintiffs would not have paid this money had they known that the Infant Formulas included levels of Heavy Metals.  Further, should Plaintiffs encounter the Infant Formulas in the future, they could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

33.     Defendant Abbott Laboratories is a Delaware corporation with a principal place of business in Abbott Park, Illinois, in Lake County. Defendant has intentionally availed itself of the laws and markets of this District, and Defendant is subject to personal jurisdiction in this District.

34.     Defendant, one of the largest producers of infant formula products in the world, has formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Infant Formulas under the Similac® name throughout the United States, including in this District. It has done so continuously throughout the Class Period from March 1, 2016 to present. Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair,

misleading, and/or deceptive packaging and related marketing for the Infant Formulas that did not disclose the presence of Heavy Metals. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing of both the ingredients and finished Infant Formulas.

35. Plaintiffs relied upon the material Omissions from the Infant Formulas' packaging, which was prepared, reviewed, and/or approved by Defendant and its agents at its headquarters in Illinois and disseminated by Defendant and its agents through the Omissions from the packaging. The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Infant Formulas.

36. The Infant Formulas, at a minimum, include:

(a) Similac® Soy Isomil:



(b)     Similac® 360 Total Care:



(c)     Similac® Pro Advance Label:



(d)     Similac® Advance OptiGRO Powder – Milk-Based:



(e)     Similac® Neosure:



## FACTUAL ALLEGATIONS

### I.    Heavy Metals are Present in Baby Foods

37.    The presence of Heavy Metals in baby foods, to include infant formulas, has been investigated and acknowledged by independent third parties.

38.    Investigations by Healthy Babies Bright Futures,[14] Consumer Reports,[15] and studies by the Food and Drug Administration ("FDA"),[16] University of Miami, the Clean Label Project, and Ellipse Analytics[17] show the presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods.

39.    The Congressional Committee Report, published on February 4, 2021, followed by a subsequent report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods, stating that Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.[18]

---

[14] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?*, at 12, 20, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed March 11, 2022) ("HBBF Report").

[15] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know*, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed March 11, 2022) ("Consumer Reports: Heavy Metals in Baby Food").

[16] https://www.fda.gov/media/77948/download (last accessed March 11, 2022) ("FDA Total Diet Study").

[17] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at: https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub (last accessed March 11, 2022) *("Lead and Cadmium Contamination in Infant Formulas and Baby Foods").*

[18] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

40.     Given the concern about Heavy Metals in baby foods, the federal and state governments are contemplating acceptable levels of Heavy Metals in foods for infants and toddlers.

41.     The Baby Food Safety Act of 2021 (the "Baby Food Safety Act") is pending in the U.S. Senate and U.S. House.[19] The Baby Food Safety Act would amend the Federal Food, Drug, and Cosmetic Act to limit the presence of toxic elements in, and otherwise regulate, infant and toddler food.

42.     Specifically, the Baby Food Safety Act would establish the following maximum levels of certain toxic elements allowable in infant and toddler food:

| Toxic Element | Proposed Action Level |
| --- | --- |
| Inorganic arsenic | 10 ppb for infant and toddler food (except cereal) and 15 ppb for infant and toddler food that is cereal |
| Cadmium | 5 ppb for infant and toddler food (except cereal) and 10 ppb for infant and toddler food that is cereal |
| Lead | 5 ppb for infant and toddler food (except cereal) and 10 ppb for infant and toddler food that is cereal |
| Mercury | 2 ppb |

43.     The FDA, through its Closer to Zero Initiative ("Action Plan"), is reviewing the levels of Heavy Metals in baby foods, including infant formulas, and considering action levels for certain toxic elements as appropriate.[20] The FDA states that it has "prioritized babies and young children because their smaller body sizes and metabolism make them more vulnerable to the

---

[19] S.1019, introduced March 25, 2021, available at https://www.congress.gov/117/bills/s1019/BILLS-117s1019is.pdf (last accessed March 11, 2022) and H.R.2229, introduced March 26, 2021, available at https://www.congress.gov/117/bills/hr2229/BILLS-117hr2229ih.pdf (last accessed March 11, 2022) (collectively, "Baby Food Safety Act").

[20] "Closer to Zero: Action Plan for Baby Foods," https://www.fda.gov/food/metals-and-your-food/closer-zero-action-plan-baby-foods (last accessed March 11, 2022) ("Action Plan").

harmful effects of these contaminants."[21] The Action Plan is an "iterative approach for achieving continual improvements over time."[22]

44.     As a result of a legal settlement, California has established ingredient sourcing and quality control processes to significantly reduce levels of lead in infant and toddler formula products.[23] For most of these products to be sold in the market, the maximum allowable levels of lead is 5 to 7 ppb.[24]

45.     And based upon information and belief, at least one state, Washington, stated it would also consider filing a similar suit if infant formula containing toxic metals such as lead were sold in Washington.

46.     Any proposed action or allowable levels  would only prohibit the baby foods from being placed in the market if the product exceeds those levels; the designated levels would not require any presence of Heavy Metals under those levels be disclosed on the product's packaging.

47.     Thus, despite the consideration of action or allowable levels of Heavy Metals in food for children, these proposals, plans, and settlements do not address the basis of this lawsuit: the disclosure of these toxins on the product packaging.[25]

## II.     Defendant Falsely Marketed Its Infant Formulas as Healthy, Nutritious, and Made with Superior Ingredients by Omitting Any Mention of Heavy Metals

---

[21] *Id.*

[22] *Id.*

[23] https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-settlement-perrigo-improve-safety-infant-and (last accessed March 11, 2022) ("Settlement").

[24] *Id.*

[25] *See*, *generally*, Action Plan, *supra*; Baby Food Safety Act, *supra*; Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*; Settlement, *supra*.

48.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Infant Formulas throughout the United States, including Illinois.

49.     Defendant's Infant Formulas are available at numerous retail and online outlets. The Infant Formulas are widely advertised.

50.     Defendant advertises its Infant Formulas as the "#1 Pediatrician Recommended Brand for Immune Support," "#1 Brand Fed in Hospitals," and "#1 Brand Chosen by Parents."



51.     On its website, Defendant "promise[s] to nourish the journey of parents and their babies."[26] Defendant informs consumers that its Products have "no artificial growth hormones" and "no palm olein oil[.]"[27] Defendant claims that it "continues to give moms new ways to nourish their babies with options like hypoallergenic, soy, organic, sensitive, and non-GMO formulas."[28]

52.     Defendant touts its innovations to its Infant Formula and provides thorough information about the ingredients in its formulas to consumers on an FAQ section of its website.[29]

---

[26] https://www.similac.com/why-similac.html (last accessed March 11, 2022).

[27] https://www.similac.com/why-similac.html (last accessed March 11, 2022).

[28] https://www.similac.com/why-similac.html (last accessed March 11, 2022).

[29] https://www.similac.com/baby-tools-resources/baby-questions.html (last accessed March 11, 2022).

53.     Defendant promotes its "heritage" as "[a] spirit of innovation that began in 1925 and hasn't stopped since[.]"[30]

54.     Based on Defendant's decision to wholly omit mention of the presence of Heavy Metals in the Infant Formulas, and to instead package its Infant Formulas as healthy, nutritious, and made with superior ingredients, it had a duty to ensure that the Products' packaging was true and not misleading. As such, Defendant knew or should have known the Infant Formulas included nondisclosed Heavy Metals and that over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

55.     Defendant intentionally omitted the presence (or material risk) of Heavy Metals in the Infant Formulas in order to induce and mislead reasonable consumers to purchase its Infant Formulas.

56.     With Defendant marketing its Infant Formulas as healthy, nutritious, and made with superior ingredients to nourish babies, Defendant clearly recognizes the importance of its Infant Formula to the development of infants.

57.     As a result of the material Omissions, a reasonable consumer would have no reason to suspect the presence (or material risk) of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of these Products.

**III.     Due to the Presence and Material Risk of Heavy Metals in the Infant Formulas, the Omissions are Misleading**

---

[30] https://www.similac.com/why-similac.html (last accessed March 11, 2022).

58.     At all times during the Class Period, Defendant knew or should have known the Infant Formulas included undisclosed Heavy Metals and were not sufficiently tested for the presence and material risk of Heavy Metals.

59.     Defendant's Infant Formulas included undisclosed levels of Heavy Metals due to Defendant's failure to monitor for the presence in the ingredients and finished products. Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Class despite having a duty to disclose.

60.     Defendant knew or should have known that Heavy Metals pose health risks to infants.

61.     Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals in the Infant Formulas to the extent reasonably possible.

62.     Defendant knew or should have known they owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formulas.

63.     Defendant knew consumers purchased the Infant Formulas based on the reasonable expectation that Defendant manufactured the Infant Formulas to the highest standards. Based on this expectation, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Infant Formulas to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formulas, which would include testing the Infant Formulas' ingredients and finished products for Heavy Metals.

64.     The Congressional Committee Report acknowledged that Heavy Metals "can endanger infant neurological development."[31]

---

[31] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to*

65.     The FDA and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[32]

66.     Additionally, while there are no U.S. federal regulations regarding acceptable levels of Heavy Metals in infant formulas, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[33]

67.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[34]

68.     Arsenic, lead, mercury, and cadmium—the Heavy Metals found in the Infant Formulas—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals "diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[35]

---

*Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed March 11, 2022) ("Toxic Heavy Metals in Popular Baby Foods").

[32] Congressional Committee Report, *supra*, at 2.

[33]*Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed March 11, 2022) ("Some Baby Food May Contain Toxic Metals").

[34]FDA: *Metals and Your Food*; available at https://www.fda.gov/Food/FoodborneIllness Contaminants/Metals/default.htm (last accessed March 11, 2022).

[35] HBBF Report, *supra*, at 13.

69.     The four Heavy Metals (arsenic, cadmium, lead, and mercury) "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ("ADHD")."[36] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[37]

70.     Because Heavy Metals accumulate in the body, including in the kidneys and other internal organs, the risk they pose grows over time and can remain in one's body for years.[38]

71.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[39]

72.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[40] Heavy Metals disturb the body's metabolism and cause "significant changes in various biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[41]

---

[36] *Id.* at 6.

[37] Congressional Committee Report, *supra*, at 1.

[38] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[39] *Id.*

[40] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco.* Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069; PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed March 11, 2022).

[41] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014).

73.     Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[42]

74.     Due to the impact of Heavy Metals on child development, certain senators have urged the FDA to "finalize action levels that eliminate [] toxic heavy metals."[43]

75.     Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the risk of various health issues, including the risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[44]

76.     Research continues to confirm that exposures to food containing arsenic, lead, mercury, and cadmium causes "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[45]

77.     However, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants.[46]

*Toxicity, mechanism and health effects of some heavy metals*. Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009 (last accessed March 11, 2022).

[42] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[43] https://www.klobuchar.senate.gov/public/_cache/files/9/9/996f2cad-5295-432b-a543-f6931298a78/37D015A1AC9DDF0E31B341F629469169.6.22.2021-formatted-letter-to-fda-on-baby-food-recall.pdf (last accessed Feb. 26, 2022) ("Senators' Letter to the FDA").

[44] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[45] HBBF Report, *supra*, at 1.

[46] *See e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-

78.     Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formulas without disclosing the presence of risk of arsenic, mercury, cadmium, and lead to consumers like Plaintiffs.

*Arsenic*

79.     The Infant Formulas contain (or have a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[47] "[E]ven low levels of arsenic exposure can impact a baby's neurodevelopment."[48] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[49]

80.     Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central nervous systems and cognitive development.[50] Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[51]

---

it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed March 11, 2022); *see also* 21 CFR §172, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?CFRPart=172&showFR=1 (last accessed March 11, 2022).

[47] HBBF Report, *supra*, at 13.

[48] Senators' Letter to the FDA, *supra* (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/) (last accessed March 11, 2022).

[49] *Id*.

[50] Congressional Committee Report, *supra*, at 10.

[51] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. Available at https://doi.org/10.1371/journal.pone.0038713 (last accessed March 11, 2022) ("Prenatal Arsenic Exposure").

81.     Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[52] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[53]

82.     Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[54]

83.     Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 ppb for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[55]

84.     Although the FDA has not set the action level for arsenic in infant formulas specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be consumed by very young children."[56] The FDA's limit for bottled water is 5 ppb[57].

85.     Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports had said "[t]*here is no safe level of heavy metals*, so the goal should be to have no

---

[52] *Id.*

[53] Genuis SJ, Schwalfenberg G, Siy A-KJ, Rodushkin I (2012) Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations. PLOS ONE 7(11): e49676. Available at https://doi.org/10.1371/journal.pone.0049676 (last accessed March 11, 2022) ("Toxic Element Contamination of Natural Health Products").

[54] HBBF Report, *supra*, at 3.

[55] Toxic Heavy Metals in Popular Baby Foods, *supra*.

[56] FDA, Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level (Apr. 2016), available at https://www.fda.gov/media/97234/download#:~:text=The%20action%20level%20for%20inorganic,on%20sampling%20and%20testing%20results (last accessed March 11, 2022).

[57] 21 C.F.R. §165.110(b)(4)(iii)(A).

---

measurable levels of any heavy metal in baby and toddler foods."[58] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant formula as a key source of nutrients and that unless breastmilk is an option, formula is the only food babies younger than 5 months can eat for their development and growth.

86.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 6.7 ppb, an amount that is especially concerning considering the amount of infant formula consumed by developing children.

*Cadmium*

87.     The Infant Formulas also contain (or have a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

88.     Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[59]

89.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[60] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined

---

[58] Congressional Report Finds More Problems With Heavy Metals in Baby Food (updated Oct. 2021), available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9CThere%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed March 4, 2022) (emphasis added).

[59] HBBF Report, *supra*, at 14.

[60] *Id*.

that cadmium is a probable human carcinogen.[61] Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequesters in [human] tissue."[62]

90.     The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb, 40 C.F.R. §141.62; the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[63]

91.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed cadmium levels as high as 11.4 ppb.

*Lead*

92.     The Infant Formulas contain (or have a material risk of containing) lead, which is a probable carcinogen.[64]

93.     Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

94.     Exposure to lead in foods builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

---

[61] Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed March 11, 2022).

[62] Toxic Element Contamination of Natural Health Products, *supra*.

[63] Congressional Committee Report, *supra*, at 29.

[64] American Cancer Society, "Known and Probable Carcinogens," Last Revised August 14, 2019, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed March 11, 2022).

95. Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[65]

96. Lead is extremely toxic, and its effects cannot be reversed or remediated.[66]

97. One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[67] Additionally, studies have established a link between lead exposure and ADHD.[68]

98. Although there is no federal standard for lead in baby food, health experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[69]

99. Despite this, laboratory tests indicate Defendant sold products containing undisclosed lead levels as high as 4.6 ppb.[70]

*Mercury*

100. The Infant Formulas contain (or have a material risk of containing) mercury, which increases the risk for cardiovascular disease. Exposure to mercury has been linked to higher risk of lower IQ scores and intellectual disability.[71]

101. Although there is no maximum contaminant level for Mercury in infant formulas, the EPA has set a maximum contaminant level for Mercury in drinking water at 2 ppb.[72]

---

[65] HBBF Report, *supra*, at 13.

[66] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[67] HBBF Report, *supra*, at 7.

[68] Congressional Committee Report, *supra*, at 12.

[69] Toxic Heavy Metals in Popular Baby Foods, *supra*.

[70] HBBF Report at 20, 34, *supra*.

[71] *Id*. at 14.

[72] Congressional Committee Report, *supra*.

Regardless, "there is no known safe level" of exposure to Mercury as it is a "highly toxic element."[73]

102.    Despite Defendant's packaging claims that its Infant Formulas are nutritious, healthy, and made with superior ingredients, laboratory tests indicate Defendant sold Products containing undisclosed mercury levels as high as 10.1 ppb.

103.    The four Heavy Metals – Arsenic, Cadmium, Lead, and Mercury – are significant detriments to children.

104.    The FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its Toxic Elements Working Group, which is aimed toward reducing human exposure to contaminants in dietary supplements, food and cosmetics.[74]

105.    Importantly, and relevant to this lawsuit, action levels do not require disclosure of the presence of Heavy Metals on the packaging of products' that are placed in the market. Action levels only set limits for determining when products cannot be placed in the market.

106.    Despite the material risk and/or actual presence of these unnatural and potentially harmful chemicals, Defendant fails to disclose the presence of Heavy Metals.

107.    Based on the foregoing, reasonable consumers, like Plaintiff, would consider the inclusion (or risk of inclusion) of Heavy Metals a material fact when considering what infant formulas to purchase.

---

[73] Mercury Exposure and Children's Health, *supra.*

[74] FDA, "Metals and Your Food," Current as of April 8, 2021, available at https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food (last accessed March 11, 2022).

108.     Defendant knew that monitoring for Heavy Metals in its ingredients and Infant Formulas was not only important, but also critical.

109.     Defendant also knew that monitoring Heavy Metals was likewise important to its health-conscious consumers to protect their babies.

## IV.     Infant Formulas Can Be Manufactured Without Measurable Levels of Heavy Metals

110.     In contrast to the levels of Heavy Metals found in Defendant's Infant Formulas, other infant formula manufacturers have produced infant formulas that are free of Heavy Metals or with levels that are not measurable.

111.     The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[75]

112.     Bobbie, a manufacturer of infant formula (recognized by the Clean Label Project for manufacturing products that were free from Heavy Metals) was a recipient of the Clean Label Project's Purity Award.[76]

113.     Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels low enough to not cause concern, as well as some products with Heavy Metal levels that were not measurable.[77] "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[78]

---

[75] https://cleanlabelproject.org/purity-award/ (last accessed March 11, 2022).

[76]     https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed March 11, 2022).

[77] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[78] *Id*.

114.    In testing conducted by Consumer Reports, approximately one-third of tested products had levels of Heavy Metals that were below levels of concern and other products had immeasurable levels of Heavy Metals.[79] As stated by Dr. James E. Rogers, the Consumer Reports Director of Food Safety Research and Testing, "Every category of food was represented in that lower-risk group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[80]

115.    The FDA Total Diet Study also demonstrated that infant formulas can be manufactured without detectable levels of Heavy Metals.[81]

116.    In addition, because of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[82] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[83] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[84]

117.    Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas in order to achieve non-detectable or zero levels by adequately monitoring

---

[79] *Id.*

[80] *Id.*

[81] FDA Total Diet Study, *supra*, at 7, 10, 17, 20, 68, 71, 95-96.

[82] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*. Journal of public health management and practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed March 11, 2022).

[83] *Id.*

[84] *Id.*

its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained higher levels of Heavy Metals.

118.    Defendant also knew it was not monitoring and testing for Heavy Metals in the Infant Formulas. Defendant knew its failure to monitor and test for Heavy Metals in the Infant Formulas continued throughout the Class Period.

119.    Defendant's marketing was misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals and for failure to disclose the presence (or material risk) of Heavy Metals in the Infant Formulas.

120.    Defendant knew or should have known consumers paid the price premium and expected Defendant to test and monitor for Heavy Metals and disclose the presence or risk of Heavy Metals in the Infant Formulas and ingredients.

121.    At all times during the Class Period, Defendant did not monitor or test for Heavy Metals in the Infant Formulas and ingredients and Defendant did not disclose the presence or risk of Heavy Metals in its Products.

122.    Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formulas and ingredients, and to disclose the presence or risk of any levels of Heavy Metals in its Products.

123.    Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals that were inconsistent with its marketing.

124.    Defendant knew or should have known that, in order to comply with its marketing, consumers expected them to ensure the Infant Formulas were monitored and tested for Heavy Metals, and to disclose the presence (or material risk) of Heavy Metals.

125. Defendant knew, yet failed to disclose, its lack of testing and knowledge of the risk or presence of Heavy Metals in the Infant Formulas' ingredients.

126. Defendant's above-referenced statements, representations, and Omissions are false, misleading, and crafted to deceive the public as they create an image that the Infant Formulas are nutritious and free of Heavy Metals.

127. Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Products. Defendant's nondisclosure and/or concealment of the presence (or risk) of Heavy Metals in the Infant Formulas alleged herein intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class, to purchase Products they would not have if the true quality and ingredients were disclosed.

## V. The Material Omissions Misled and Deceived Reasonable Consumers

128. The Omissions wrongfully convey to consumers that Defendant's Infant Formulas have certain superior quality and characteristics that they do not actually possess.

129. For instance, although Defendant misleadingly causes consumers to believe its Infant Formulas do not contain Heavy Metals due to the material Omissions, the Infant Formulas do in fact contain undisclosed levels of Heavy Metals, which is material information to reasonable consumers.

130. Plaintiffs' counsel had three of Defendant's Infant Formulas tested and that testing confirmed the presence of undisclosed Heavy Metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) | Mercury (ppb) |
|---|---|---|---|---|
| Similac® Soy Isomil | 6.0 | 11.4 | 2.9 | <1.8 |
| Similac® 360 Total Care | 6.7 | 1.4 | 1.5 | <1.8 |
| Similac® Pro Advance | 2.5 | <1.3 | 3.0 | 10.1 |

131.     As stated herein, no level of Heavy Metals is safe.[85]

132.     Based on the Omissions, a reasonable consumer would not suspect the presence of Heavy Metals, nor would a reasonable consumer be able to detect the presence of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

133.     Reasonable consumers must and do rely on Defendant to honestly report what its Infant Formulas contain.

134.     Based on the impression given by the packaging, no reasonable consumer could expect or understand that the Infant Formulas contained Heavy Metals.

135.     In light of Defendant's statements regarding the quality of the Infant Formulas, including its commitment to innovative formulas and superior ingredients, Defendant knew or should have known the Infant Formulas contained or may contain Heavy Metals.

136.     Defendant had a duty to ensure the Infant Formulas were not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed.

137.     Defendant acted knowingly, recklessly, and/or intentionally with its deceptive packaging based on the material Omissions.

138.     Defendant knew that properly and sufficiently monitoring the Infant Formulas for Heavy Metals in their ingredients and finished Infant Formulas was not only important, but also critical.

---

[85] Some Baby Food May Contain Toxic Metals, *supra*.

139.    Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her child, making it a significant source of food and nutrition for the child.  This leads to repeated exposure to the Heavy Metals to the child.

140.    Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas by properly monitoring their ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or may contain higher levels of Heavy Metals.

141.    The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiff, in their purchasing decisions.  This is true especially considering the long-standing campaign by Defendant to market the Infant Formulas as healthy, nutritious, and made with superior ingredients, and to induce consumers, such as Plaintiff, to purchase the Products.

142.    The Omissions make the Infant Formulas' packaging deceptive based on the presence (or risk) of Heavy Metals in the Infant Formulas.  Reasonable consumers, like Plaintiffs, would consider the mere presence (or risk) of Heavy Metals in the Infant Formulas a material fact when considering what infant formula to purchase.

143.    At all times during and throughout the Class Period, Defendant knew it was not sufficiently and consistently monitoring or testing the Infant Formulas or their ingredients for Heavy Metals.

144.    Defendant knew, yet failed to disclose, its lack of regular testing, monitoring, and knowledge that the Infant Formulas and/or ingredients used in the Infant Formulas included undisclosed levels of Heavy Metals.

145. Defendant's packaging was misleading due to Defendant's failure to properly and sufficiently monitor for and to disclose the material risk of the presence of Heavy Metals in the Infant Formulas.

146. Defendant knew or should have known the Infant Formulas contained or may contain undisclosed levels of Heavy Metals that were inconsistent with their packaging.

147. Defendant knew or should have known that reasonable consumers expected it to ensure the Infant Formulas and ingredients were monitored and tested for Heavy Metals to ensure compliance with their packaging.

148. Defendant knew or should have known consumers paid premium prices and expected Defendant to regularly test for Heavy Metals and sufficiently monitor the Infant Formulas and ingredients for the presence of Heavy Metals.

149. The Omissions are material and render the Infant Formulas' packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formulas are high quality, healthy, nutritious, and a superior product, and are free of Heavy Metals.

150. Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt or question Defendant's statements regarding the quality of the Infant Formulas. Based on the impression given by the packaging, no reasonable consumer could expect or understand that the Infant Formulas contained Heavy Metals.

151. The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class, to purchase products they would not have if the true quality and ingredients were disclosed or for which they would not have paid a premium price.

152. As a result of Defendant's deceptive packaging of the Infant Formulas, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap

enormous profits from, consumers who paid the purchase price or premium for the Infant Formulas that were not as advertised.

### PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

153.     Plaintiffs read and relied upon the packaging of the Infant Formulas when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the presence of Heavy Metals from its packaging, they would not have purchased the Infant Formulas.

154.     A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

### DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACH OF ITS IMPLIED WARRANTIES

155.     Defendant had sufficient notice of its breach of implied warranties.  Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Infant Formulas, and whether the ingredients contained Heavy Metals.

156.     Moreover, Defendant was put on notice by in March and September of 2021, when Congress publicly released findings regarding the presence of Heavy Metals in baby foods.[86] The FDA has also released a study showing the presence of Heavy Metals in baby foods, including infant formulas.[87]

157.     Defendant did not change its packaging to include any disclaimer that the Infant Formulas included levels of Heavy Metals.

---

[86] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[87] FDA Total Diet Study, *supra*, at 7, 10, 17, 20, 68, 71, 95-96.

**PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASS**

158.   Defendant knew that reasonable consumers such as Plaintiffs and the proposed Class members would be the end purchasers of the Infant Formulas and the targets of its advertising, marketing, packaging, and statements.

159.   Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formulas, including Plaintiffs and the proposed Class members.

160.   Defendant directly marketed to Plaintiffs and the proposed Class through its packaging.

161.   Plaintiffs and the proposed Class members are the intended beneficiaries of the implied warranties.

**APPLICABILITY OF EQUITABLE TOLLING AND**
**THE DISCOVERY RULE TO THE STATUE OF LIMITATIONS**

162.   Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

163.   The statute of limitations is tolled for the Plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act and common law claims due to Defendant's fraudulent concealment of the presence (or risk) of Heavy Metals in its Infant Formulas.

164.   Defendant intentionally concealed material facts to Plaintiffs when it Omitted the presence (or risk) of Heavy metals in its Infant Formulas.

165.   Defendant knew the presence (or risk) of Heavy Metals in infant materials are a material consideration for any parent buying infant formulas.

166.   Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act by deceiving customers as to the true nature as to the quality and makeup of the Infant Formulas.

167.    The discovery rule time-bars also Plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act and unjust enrichment claims.

168.    Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover the presence of Heavy Metals in the Defendant's Infant Formulas unless they conducted independent testing.

169.    Plaintiffs did not know of the presence (or risk) of Heavy Metals in Defendant's Infant Formulas because Defendant did not disclose the presence (or risk) of Heavy Metals on the Products' packaging. Instead, Defendant only represented that the Infant Formulas were healthy, nutritious, and made of high quality to support growing infants, whom Defendants knew or should have known are most vulnerable to toxins.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rules 23(a), 23(b)(2) and (3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons who, from March 1, 2016 to the present, purchased the Infant Formulas for household use, and not for resale (the "Class").

171.    Plaintiff Willoughby brings this action individually and on behalf of the following Illinois Subclass:

> All persons who are citizens of Illinois who, from March 1, 2016 to the present, purchased the Infant Formulas for household use, and not for resale (the "Illinois Subclass").

172.    Plaintiff McNealy brings this action individually and on behalf of the following Minnesota Subclass:

> All persons who are citizens of Minnesota who, from March 1, 2016 to the present, purchased the Infant Formulas for household use, and not for resale (the "Minnesota Subclass").

173.    Excluded from the Class and Subclass (collectively, "Classes") are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

174.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

175.    The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

176.    Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)    whether Defendant owed a duty of care;

(b)    whether Defendant owed a duty to disclose;

(c)    whether Defendant knew or should have known that the Infant Formulas contained or may contain Heavy Metals;

(d)    whether Defendant failed to disclose that the Infant Formulas contained or may contain Heavy Metals;

(e)    whether the claims of the Plaintiffs and the Classes serve a public benefit;

(f)    whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

(g)    whether the Omissions are material to a reasonable consumer;

(h)     whether the inclusion of Heavy Metals in the Infant Formulas is material to a reasonable consumer;

(i)     whether the Omissions are likely to deceive a reasonable consumer;

(j)     whether Defendant had knowledge that the Omissions were material and false, deceptive, and misleading;

(k)     whether Defendant breached its duty of care;

(l)     whether Defendant breached its duty to disclose;

(m)     whether Defendant violated the laws of the State of Illinois;

(n)     whether Defendant violated the laws of the State of Minnesota;

(o)     whether Defendant breached its implied warranties;

(p)     whether Defendant engaged in unfair trade practices;

(q)     whether Defendant engaged in false advertising;

(r)     whether Defendant made fraudulent omissions;

(s)     whether Plaintiff and Class members' claims are tolled based on Defendant's fraudulent concealment;

(t)     whether Plaintiffs and members of the Classes are entitled to actual, statutory, and punitive damages; and

(u)     whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

177.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions,

if any, are not prevalent in comparison to the numerous common questions that dominate this action.

178.    Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

179.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, has no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

180.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

181.    Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

182.    As a result of the foregoing, class treatment is appropriate.

### CLAIMS FOR RELIEF

### COUNT I
**Violation of Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 Ill. Comp. Stat. §505/1, *et seq*., Against
Defendant on Behalf of the Class or, Alternatively, the Illinois
Subclass**

183.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

184.    Plaintiffs and the Class are a "person" within the meaning of 815 Ill. Comp. Stat. §505/1(c).

185.    Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. §505/1(c).

186.    The Infant Formulas are "merchandise" within the meaning of 815 Ill. Comp. Stat. §505/1(b).

187.    There was a sale of merchandise within the meaning of 815 Ill. Comp. Stat. §505/1(d).

188.    The conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §505/1, *et seq*. ("ICFA").

189.    Defendant engaged in a deceptive act or practice in violation of ICFA by knowingly concealing, omitting, or failing to disclose the Infant Formulas' true quality, ingredients, and suitability for consumption by infants with no development or health risks.

190.    Defendant's deceptive acts and practices are continuing.

191.    Defendant intended for Plaintiffs and the Class members to rely on and accept as true the Products' packaging and Omissions in deciding whether to purchase the Infant Formulas, and at what price.

192.    Defendant's concealment, Omissions, and other deceptive conduct were likely to deceive consumers with respect to the Infant Formulas' quality, ingredients, and suitability for consumption by infants with no development or health risks.

193.    Defendant's concealment, Omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Infant Formulas.

194.    Defendant's concealment, Omissions, and other deceptive acts occurred before Plaintiff and the Class decided to purchase the Infant Formulas.

195.    Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive Plaintiff and the Class with respect to the Infant Formulas' quality, ingredients, and suitability for consumption by infants with no development or health risks.

196. Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive and cause Plaintiff and the Class members to purchase and/or overpay for the Infant Formulas.

197. Defendant's concealment, Omissions, and other deceptive conduct described herein repeatedly occurred in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

198. The facts concealed, omitted, or not disclosed by Defendant with respect to the presence of Heavy Metals that do not conform to the packaging are material facts because Plaintiffs and any reasonable consumer would have considered those facts important in deciding whether to purchase the Infant Formulas, and at what price.

199. If Plaintiffs and the Class members had known that the Infant Formulas did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Infant Formulas.

200. If Plaintiffs and the Class members had known that the Infant Formulas did not in fact match the quality and ingredients described above, they would not have purchased the Infant Formulas at all.

201. As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages, in that they purchased Infant Formulas at a price far greater than they would have paid if they had knowledge of the presence of Heavy Metals that do not conform to the Infant Formulas' packaging.

202. As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages, in that they purchased Infant Formulas that they would not have purchased at all

if they had knowledge of the presence of Heavy Metals that do not conform to the Infant Formulas'
packaging.

203.    As a direct and proximate result of the deceptive, misleading, unfair, and
unconscionable practices of the Defendant set forth above, Plaintiffs and the Class members are
entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth
in Section 10a of the ICFA.

204.    Defendant's deceptive, misleading, unfair, and unconscionable practices set forth
above were done willfully, wantonly, and maliciously, entitling Plaintiffs and the Class members
to an award of punitive damages.

### COUNT II
**Breach of Implied Warranty of Merchantability Against
Defendant on Behalf of the Class or, Alternatively, the State
Subclasses**

205.    Plaintiffs incorporate by reference and reallege each and every allegation contained
above, as though fully set forth herein.

206.    Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Class.

207.    There was a sale of goods from Defendant to Plaintiffs and the members of the
Class.

208.    At all times mentioned herein, Defendant manufactured and sold the Infant
Formulas, and prior to the time the Infant Formulas were purchased by Plaintiffs and the Class,
impliedly warranted that the Infant Formulas were of merchantable quality and fit for their ordinary
use (consumption by infants with no development or health risks).

209.    Plaintiffs and the Class relied on these implied warranties when they purchased the
Baby Foods.

210.    The Infant Formulas were not fit for their ordinary use (consumption by infants

with no development or health risks) as they include undisclosed levels of Heavy Metals that do not conform to the packaging.

211.    These promises became part of the basis of the bargain between Defendants and Plaintiffs and the Class members, and thus constituted implied warranties.

212.    Defendant breached the implied warranties by selling Infant Formulas that contain Heavy Metals.

213.    Defendant was on notice of this breach as it was aware of the inclusion of Heavy Metals.

214.    Privity exists because Defendant impliedly warranted to Plaintiffs and the Class members through the Products' packaging that the Infant Formulas were healthy, nutritious, and safe for consumption and by failing to mention or disclose the presence of Heavy Metals.

215.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Class suffered actual damages as they purchased the Infant Formulas that were worth less than the price paid and that they would not have purchased at all had they known of the presence of Heavy Metals.

216.    Plaintiffs, on behalf of themselves and the Class, seek actual damages for Defendants' failure to deliver goods that conform to their implied warranties and resulting breach.

### COUNT III
**Fraudulent Misrepresentation by Omission Against Defendant
on Behalf of the Class or, Alternatively, on Behalf of the State
Subclasses**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and her counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

B.      An order enjoining Defendant from selling the Infant Formulas until the higher and/or unsafe levels of Heavy Metals are removed;

C.      An order enjoining Defendant from selling the Infant Formulas until any levels, or risk of any levels, of Heavy Metals are disclosed on the Products' labels, packaging, and advertising;

D.      An order enjoining Defendant from selling the Infant Formulas in any manner suggesting or implying that they are healthy, nutritious, and made from superior ingredients;

E.      An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling its existing Infant Formulas;

F.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

G.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Illinois law or Minnesota law, plus pre- and post-judgment interest thereon;

H.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

K.      An order requiring Defendant to pay punitive damages on any count so allowable;

L.      An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

M.　　An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  March 14, 2022

WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA

By: */s/ Kara A. Elgersma*
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
Email: kaw@wbe-llp.com
　　　　kae@wbe-llp.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
　　　　rapeterson@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON (pro hac vice)
CATHERINE SUNG-YUN K. SMITH
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
csmith@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
Charles LaDuca
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone:(202) 789-3960
Facsimile: (202) 789-1813
E-mail: charles@cuneolaw.com

SALTZ MONGELUZZI & BENDESKY, PC
Simon B. Paris, Esq.
Patrick Howard, Esq.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
Email: sparis@smbb.com
Email: phoward@smbb.com

**Counsel for Plaintiffs**