**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE WILLOUGHBY, LAKENDREA CAMILLE MCNEALY, BRITTNEY GRAY, LANI JOHNSTON, ASHLEY POPA, and DENIEGE REVORD, individually and on behalf of a class of similarly situated individuals.** | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 1322** |
| **ABBOTT LABORATORIES,** | ) ) | |
| **Defendant.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

This case currently has six plaintiffs—Charlotte Willoughby, Lakendrea Camille McNealy, Brittney Gray, Lani Johnston, Ashley Popa, and Deniege Revord—who filed suit against Abbott Laboratories on behalf of themselves and others similarly situated. The plaintiffs allege they purchased Similac brand infant formula products manufactured and distributed by defendant Abbott Laboratories. They contend those products contained heavy metals not disclosed on Abbott's labelling, and they assert claims for violations of state consumer protection acts, common law fraud, unjust enrichment, and breach of the implied warranty of merchantability. Abbott has moved for summary judgment based on lack of standing, and alternatively for summary judgment on the merits if the plaintiffs are found to have standing. For the reasons stated below, the Court concludes that the plaintiffs have standing but grants Abbott's motion for summary

judgment on the merits.

## Background

The following facts are undisputed unless otherwise noted.  Abbott is a leading supplier of infant formula in the United States.  It produces formula under the brand Similac.  The plaintiffs purchased Similac brand powdered infant formula products, although some did so with a government-supplied voucher.

In 2019, testing of Similac formula indicated the presence of heavy metals, including lead, cadmium, mercury, and arsenic.  Abbott did not disclose Similac contained heavy metals on its labelling.  The plaintiffs, however, did not test the formula powder they purchased for heavy metals before their children consumed it.  The plaintiffs have also stipulated that they will not present evidence that their children have or will suffer any adverse health effects from the formula:  "Plaintiffs will not offer any evidence or argument . . . that their own child(ren) will experience, or are at an elevated risk of experiencing, any disease, illness, symptom, or other negative health condition as a result of consuming Similac containing heavy metals."  Health History Stipulation ¶ 5.

Two of the plaintiffs, Charlotte Willoughby and Lakendrea Camille McNealy, filed the present suit against Abbott on March 14, 2022 on behalf of themselves and others similarly situated.  They later amended their complaint to add as plaintiffs Shaylynn Doxie, Lani Johnston, Ashley Popa, Brittney Gray, Kataleena Helmick, and Deniege Revord.  Relevant to this motion, the consolidated amended complaint included claims for violations of state consumer protection acts, common law fraud, unjust enrichment, and breach of the implied warranty of merchantability stemming from Abbott's failure to

disclose that Similac contained heavy metals. The plaintiffs sought damages and injunctive relief.

In April 2023, Abbott moved to dismiss the complaint for lack of standing and failure to state a claim. The Court found the plaintiffs had plausibly alleged standing to pursue damages for their claims stemming from Abbott's alleged non-disclosure, as they plausibly alleged that most of Abbott's products had the defect of containing heavy metals. The Court concluded, however, that the plaintiffs did not have standing to seek injunctive relief. The Court also dismissed Willoughby's claim for breach of the implied warranty of merchantability and Revord's unjust enrichment claim.

In May 2024, plaintiffs Shaylynn Doxie and Kataleena Helmick stipulated to dismissal of their claims without prejudice. The operative complaint thus now has six plaintiffs—Charlotte Willoughby, Lakendrea Camille McNealy, Brittney Gray, Lani Johnston, Ashley Popa, and Deniege Revord—who assert claims for damages on behalf of themselves and others similarly situated. All remaining plaintiffs continue to claim that Abbott violated the state consumer protection acts of their respective states and committed common law fraud. Every plaintiff but Willoughby also asserts a claim for breach of the implied warranty of merchantability, and every plaintiff but Revord also claims unjust enrichment.

Discovery is complete. Abbott has moved for summary judgment based on lack of standing and on the merits of the remaining claims.

## Discussion

### A.     Standing

"Article III of the Constitution limits the federal judicial power to certain 'cases'

3

and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). A case or controversy is present when a plaintiff establishes the "irreducible constitutional minimum" of standing. *Id.* (quoting *Lujan*, 504 U.S. at 559–60). Standing has three elements: "(1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) is likely, not merely speculative, that the injury will be redressed by a favorable decision." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024) ("*Recalled Formula*") (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing." *Silha*, 807 F.3d at 173.

Abbott challenges only the first element of standing: injury in fact. An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Recalled Formula*, 97 F.4th at 529 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* (quoting *Spokeo*, 578 U.S. at 338).

Although the plaintiffs alleged standing sufficiently to survive a motion to dismiss, "[a]s the litigation progresses, the way in which the plaintiff demonstrates standing changes." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020). "When litigation moves beyond the pleading stage and Article III standing is challenged as a factual matter, a plaintiff can no longer rely on mere allegations of injury; [the plaintiff] must provide *evidence* of a legally cognizable injury in fact." *Flynn v. FCA US LLC*, 39 F.4th 946, 949–50 (7th Cir. 2022). At the summary judgment stage, "the

4

plaintiff must demonstrate standing by setting forth by affidavit or other evidence specific facts that, taken as true, support each element of standing." *Spuhler*, 983 F.3d at 285 (quoting *Lujan*, 504 U.S. at 561) (cleaned up).

The plaintiffs, who have stipulated that they will not offer any evidence of physical injury to their children from the consumption of Abbott's product, rely exclusively on economic injury to establish standing. "Economic harm can be a concrete injury sufficient to confer standing." *Recalled Formula*, 97 F.4th at 529. Economic harm includes when, "as a result of a deceptive act or an unfair practice" by the defendant, a plaintiff is "deprived of the benefit of [the] bargain." *Id.* at 528 (quoting *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019)). One example of a deceptive act that deprives a plaintiff of the benefit of the bargain is the failure to disclose a "universal defect" of the product. *Id.*; *see In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("*Aqua Dots*"). A universal defect results in economic injury as plaintiffs "paid more for the [products] than they would have, had they known the risks the [products] posed." *Aqua Dots*, 654 F.3d at 751.

To show economic injury, the plaintiffs in this case propose their own universal defect theory: Abbott's formula "prohibited Plaintiffs from receiving the benefit of the bargain" by failing to disclose "a universal defect linked to a latent risk" that the formula contained heavy metals. Pls.' Mem. in Opp. to Abbott's Mot. for Summ. J., at 7. The plaintiffs have provided evidence that heavy metals are in all of Abbott's Similac formula. Although Abbott emphasizes that the plaintiffs never tested their own purchased products for heavy metals, it concedes that "most units of Similac that were tested contained detected levels of at least one Heavy Metal." Abbott's Resp. to Pls.'

Add'l Stmt. of Undisputed Material Fact ¶ 6.  And even without this testing, Abbott concedes that the ubiquity of heavy metals means nearly all food products, including its formula, contain traces of them:  "Heavy metals are naturally occurring and therefore unavoidable in the general food supply; trace levels occur in almost everything that infants and children consume . . . ."  *Id.*

The plaintiffs have also provided evidence that the presence of heavy metals in Abbott's formula is a harmful defect.  Their expert, epidemiologist Dr. Hannah E. Gardener, stated both in her initial and rebuttal report that there is "no safe level" of certain heavy metals found present in Abbott's formula, such as lead, and that the accumulation of heavy metals in the body can be dangerous to "both the health and development of babies and children" even when consumed in small amounts.  *See* Expert Rep. of Hannah E. Gardener ¶¶ 11, 53, 57; Rebuttal Rep. of Hannah E. Gardener ¶¶ 6, 11.  With evidence of both the universality of heavy metals in Abbott's formula and its defective nature, the plaintiffs have provided adequate evidence of a cognizable economic injury for standing.

Abbott's attempts to discredit the plaintiffs' economic injury are unavailing.  First, Abbott argues that a universal defect theory of economic harm is inapplicable to consumable products, citing *Recalled Formula*.  But *Recalled Formula* does not hold that a universal defect injury is relegated to durable, non-consumable products.  In *Recalled Formula*, the plaintiffs alleged that some of the defendant's infant formula had been contaminated with harmful bacteria when produced at a specific plant.  *Recalled Formula*, 97 F.4th at 527.  They argued that the presence of bacteria cost them the benefit of the bargain, as they had paid for the formula assuming it was safe.  *Id.* at 528.

The Seventh Circuit concluded the plaintiffs lacked standing, as they had not alleged that "any of the products they purchased were contaminated." *Id.* at 529. The court emphasized that because there was "no way to tell how widespread the defect" from the plant was, the plaintiffs had not alleged a "universal defect" that could establish a cognizable, particularized injury. *Id.* at 530.

In this case, the plaintiffs do not just present evidence there was widespread presence of heavy metals in Abbott's Similac formula—Abbott itself concedes as much. This is what differentiates this case from the consumable products cases Abbott cites. Usually, defects are not so widespread to allow a plaintiff to claim their untested, already consumed product was defective. *See, e.g.*, *id.* ("[P]laintiffs did not allege facts suggesting that contamination of [the defendant]'s products was sufficiently widespread so as to plausibly affect any given product, including the ones they purchased."); *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1181 (3d Cir. 2024) (concluding plaintiffs failed to plausibly allege injury when they failed to "allege they purchased contaminated products"); *Doss v. Gen. Mills, Inc.*, 816 F. App'x 312, 313 (11th Cir. 2020) (concluding plaintiff failed to plausibly allege injury when she did not "allege[] she purchased any boxes . . . that contained any [allegedly harmful] glyphosate"); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) ("Without any particularized reason to think the consumers' own packages . . . actually exhibited the alleged non-kosher defect, the consumers lack Article III standing . . . ."). Abbott concedes that heavy metals are present in its formula, as it argues it is an unavoidable consequence of the natural ingredients used. In this circumstance, the plaintiffs have provided sufficient evidence that their purchased formulas included heavy metals even without testing the

specific items they purchased, making a universal defect theory applicable.

Abbott next argues that any claimed defect in its formula cannot support economic injury as the products in question provided the nutritional benefits advertised. It relies heavily on *In re Johnson & Johnson Talcum Powder Products Marketing Sales Practices & Liability Litigation*, 903 F.3d 278 (3d Cir. 2018) ("*Talcum Powder*"), in which the Third Circuit held that a "wish to be reimbursed for a functional product . . . already consumed without incident does not itself constitute an economic injury." *Id.* at 293. The Third Circuit, however, has since clarified its holding in *Talcum Powder*, stating that it "did not hold that the *only* way to prove that an unsafe product is worth less is by alleging the product did not perform . . . as expected." *Huertas*, 120 F.4th at 1177. The Court finds *Huertas* more persuasive. Even if Abbott's formula effectively provided the nutritional benefits advertised, the plaintiffs testify they would not have purchased it if they knew it contained harmful heavy metals. This financial loss is a cognizable economic injury. *See Aqua Dots*, 654 F.3d at 751.

Finally, Abbott argues that Dr. Gardener's opinions concerning the dangerous nature of heavy metals should be excluded and thus cannot support standing. A district court is tasked with the "gatekeeping responsibility" of ensuring that expert testimony "is not only relevant, but reliable." *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024) (quoting *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 598 (1993)). The proponent of the testimony must demonstrate to the Court by a preponderance of the evidence that: "(a) the expert's scientific, technical, or other specialized knowledge will be helpful to the jury; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has

8

reliably applied the principles and methods to the facts." *Id.*; Fed. R. Evid. 702. Once the Court has fulfilled its gatekeeping role, however, it must step aside. The adversarial process is the proper place to debate the weight to be given to expert testimony that is relevant and sufficiently reliable to be admissible. *Artis*, 95 F.4th at 527 (quoting *Daubert*, 509 U.S. at 596) ("After the [gatekeeping] threshold, 'the familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' will do.").

Abbott takes issue with Dr. Gardener's "no safe level" theory, in which she effectively concludes that ingesting lead at any dose is harmful. The Court finds Dr. Gardener's testimony sufficiently reliable. Abbott does not challenge Dr. Gardener's qualifications: she has worked as an epidemiologist for roughly 17 years, with "much of [her] work . . . center[ing] around diet and other environmental causes for neurological diseases." Expert Rep. of Hannah E. Gardener ¶¶ 1–3. Her conclusions are also grounded in the "public health messaging that there is no safe level of lead exposure" and several studies "suggest[ing] . . . the rate of decline in neurodevelopment, intelligence, and academic performance is greater at the lower end of lead exposure." *Id.* ¶ 57.

Abbott contends that the no safe level theory violates the principle of toxicology that illnesses are dose dependent. The pronouncements by public health agencies that there is no safe level, according to Abbott, are just caution in the face of a lack of scientific knowledge on what the exact safe level is. In this regard, Abbott leans on its own expert reports, which argue continued consumption of Similac formula would not lead to the doses required to manifest illness.

These critiques miss the mark, as they conflate harmfulness with the manifestation of physical injury. The fact that illnesses are dose dependent does not refute Dr. Gardener's conclusion that certain heavy metals are harmful at any level. Heavy metals can be harmful, in that, with accumulation, they risk inhibiting the growth and development of a child, even if the amount in Abbott's formula would not cause injury on its own.

Nor does the plaintiffs' economic injury theory require evidence that Abbott's formula would necessarily lead to physical injury. Loss of the benefit of the bargain simply requires evidence that the plaintiffs paid more than they would have if they had known of the undisclosed presence of heavy metals in Abbott's formula. *See Aqua Dots*, 654 F.3d at 751. Although Abbott argues that a defect must in itself be unreasonably dangerous, courts have not ascribed to this view in the economic injury context. Even a non-dangerous defect can make a product worth less than expected. *See, e.g.*, *Huertas*, 120 F.4th at 1177 (noting that "a design defect resulting in waste" of eye dropper medication was sufficient to establish economic injury for standing).

An analogy drives this point home. Imagine Abbott's labeling failed to disclose a more ordinary ingredient: corn syrup. Consumers, looking for the healthiest option for their children, might choose to pay more for a formula without corn syrup than they would otherwise pay. They might pay more even if the amount of corn syrup in the formula would not in itself lead to physical injury; the health risks inherent in consuming corn syrup may be enough to drive the purchase. If it came to light that the formula did inadvertently include corn syrup, the plaintiffs would have suffered an economic injury whether or not the amount of corn syrup consumed would manifest into physical injury.

10

They paid more than they would have if the defect, the inclusion of corn syrup, had been disclosed.

The plaintiffs' argument in this case is the same. They testified they paid for Abbott's Similac formula believing it did not include heavy metals and that they would not have done so had they known heavy metals were present due to their potentially harmful effects. This loss of the benefit of the bargain is a cognizable economic injury.

Lastly, Abbott argues that even if Dr. Gardener's no safe level theory is admissible, it cannot support standing. According to Abbott, all foods have traces of heavy metals, yet many food producers do not disclose this fact. This would mean that every food purchase might result in an economic injury sufficient to support standing.

Although the concern is understandable, it is a practical concern, not one that leads to a conclusion that standing is lacking. If all consumers sustain a particularized injury due to the actions of a defendant, the injury does not become irrelevant because many more consumers have suffered a similar injury. *See Spokeo*, 578 U.S. at 339 n.7 ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."). Perhaps Abbott's true contention is that this is an issue of redressability, in which the federal court system simply cannot handle a particularized injury that affects so many people. Yet Abbott cites no caselaw to support such an argument. Under current standing doctrine, Abbott's concern about an influx of future lawsuits is not a basis to close the federal courthouse doors.

Because the plaintiffs have provided evidence that the presence of heavy metals in Abbott's formula was a universal defect, they have established an economic injury in

fact sufficient for standing.

**B.    Merits**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).  The Court cannot "make credibility determinations" or "weigh the evidence."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Still, to avoid summary judgment, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial" that go beyond a "mere scintilla of evidence."  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).

**1.    Consumer protection acts, common law fraud, and implied warranty of merchantability**

The plaintiffs claim that Abbott's failure to disclose the presence of heavy metals in its formula violates the consumer protection acts of their respective states and common law fraud and amounts to a breach of the implied warranty of merchantability. Damages is an element of all of these claims; the plaintiffs do not argue otherwise. *See, e.g.*, *Kim v. Carter's Inc.*, 598 F.3d 362, 365–66 (7th Cir. 2010) (noting that a consumer fraud action under Illinois law requires proof of actual damages); *Greenberger v. Geico Gen. Ins.*, 631 F.3d 392, 401 (7th Cir. 2011) (noting an element of

common law fraud is "damages resulting from . . . reliance" on a fraudulent misrepresentation); *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 252 (1st Cir. 2010) ("Recovery generally is not available under the warranty of merchantability where the defect that made the product unfit caused no injury to the claimant, the threat is now gone and nothing now possessed by the claimant has been lessened in value.") (citing *Carlson v. Gen. Motors Corp.*, 888 F.2d 287, 297–98 (4th Cir. 1989)). The damages resulting from loss of the benefit of the bargain are the difference between what was paid and the "actual value of the property." *See Kim*, 598 F.3d at 365 (quoting *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 628, 888 N.E.2d 1190, 1197–98 (2008)).

The plaintiffs first argue they have already proved damages, as the Court found that the plaintiffs alleged actual damages when ruling on Abbott's motion to dismiss. But at summary judgment, "[t]he nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits." *Warsco v. Preferred Tech. Grp.*, 358 F.3d 557, 563 (7th Cir. 2001) (citation omitted). Instead, the plaintiffs "must go beyond the pleadings and support [their] contentions with proper documentary evidence." *Id.* (citation omitted).

The plaintiffs have not provided this evidence. It is true that the plaintiffs have testified that "they would not have purchased, or paid the price they did for, the [formula] if they knew about the risk of or actual inclusion of heavy metals." Pls.' Mem. in Opp. to Abbott's Mot. for Summ. J., at 39. But this testimony alone does not establish damages, because it does not establish that the plaintiffs actually overpaid. A mere assertion from a plaintiff that she would not have paid the price for Abbott's formula says nothing about whether she paid more than the actual value of the formula. Nor do the plaintiffs

13

provide evidence of how much they would have paid had they known the formula contained heavy metals. Without such evidence, the plaintiffs cannot establish they paid more for the formula than it was actually worth, which is the crux of their damages theory. Any such determination of damages would require impermissible speculation. *See Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 933 (7th Cir. 2003) ("[W]e repeat previous reminders to the bench and bar of this circuit that proof of damages requires—proof.").

The plaintiffs respond that their experts have provided evidence of damages. They claim their "expert witnesses have crafted a conjoint analysis that will allow the finder of fact to quantify the price premium paid and subsequently calculate how much they overpaid for the [formula]." Pls.' Mem. in Opp. to Abbott's Mot. Summ. J., at 39. But these experts have not conducted such an analysis. Rather, these experts testify that they have a proposal for a potential conjoint survey that may prove damages. *See* Dep. of Steven P. Gaskin, at 173:3–176:6 (acknowledging that no "calculat[ion] [of] any allege[d] price premium" has occurred and that its "possible [an] analysis might show a price premium of zero"); Dep. of Colin B. Weir, at 32:13–23 (noting that a "conjoint is an empirical analysis and until you do the analysis, one would not know what the results would be"). Plaintiffs can avoid dismissal at the summary judgment stage only if they provide evidence. Proposals that *might* provide evidence are insufficient at this stage of litigation. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 976 (7th Cir. 2020) ("As a response to a motion for summary judgment, . . . a promise to come forward with more evidence soon is not sufficient."); *see also Beaty v. Ford Motor Co.*, No. C17-5201 TSZ, 2022 WL 4661610, at *1 (W.D. Wash. Sept. 30, 2022) (noting a "conjoint analysis

14

can quantify overpayment," but the plaintiffs did "not perform[] the conjoint study," so it was not evidence).

Without evidence of overpayment, the plaintiffs have not shown they lost the benefit of their bargain. Because loss of the benefit of the bargain is their sole theory of damages, the plaintiffs cannot prove the damages required for their consumer protection, fraud, and implied warranty of merchantability claims. The Court grants Abbott's motion for summary judgment on these claims.

### 2. Unjust enrichment

Lastly, most of the plaintiffs assert claims against Abbott for unjust enrichment. The plaintiffs do not dispute that their unjust enrichment claims are based on the same theory of wrongdoing as their consumer protection, fraud, and implied warranty of merchantability claims. Nor do they dispute that summary judgment on their other claims requires summary judgment on their unjust enrichment claims as well. *See, e.g.*, *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."). Because the Court granted Abbott's motion for summary judgment on the other claims, it must also grant summary judgment against the plaintiffs' unjust enrichment claim.

### Conclusion

For the reasons stated above, the Court grants Abbott's motion for summary judgment [dkt. no. 91] and directs the Clerk to enter judgment stating: Judgment is entered in favor of defendant Abbott Laboratories and against plaintiffs. The Clerk is

also directed to terminate Case No. 23 C 338, which is the master docket that included

this case and one other case that was previously dismissed.

Date: February 26, 2025

_____
MATTHEW F. KENNELLY
United States District Judge